# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

```
-------------------------------------------------- x
                                                   :
IN RE                                              :
                                                   :
THE COLONIAL BANCGROUP, INC.,                      :
                                                   :    Chapter 11
                Debtor.                            :    Case No. 09-32303 (DHW)
-------------------------------------------------- x
                                                   :
THE COLONIAL BANCGROUP, INC.,                      :
                                                   :
                Plaintiff,                         :
                                                   :
v.                                                 :    Adv. Proceeding No. _____ (DHW)
                                                   :
THE FEDERAL DEPOSIT INSURANCE                      :
CORPORATION, in its capacity as                    :
receiver for Colonial Bank,                        :
                                                   :
                Defendant.                         :
-------------------------------------------------- x
```

## COMPLAINT TO AVOID FRAUDULENT OBLIGATIONS

NOW COMES Plaintiff The Colonial BancGroup, Inc., debtor and debtor-in-possession herein (the "Debtor" or the "Plaintiff"), by and through its undersigned counsel, and for its complaint against The Federal Deposit Insurance Corporation, in its capacity as receiver for Colonial Bank (the "FDIC-Receiver" or the "Defendant"), states and shows the following:

### Nature of the Complaint

1.      Pursuant to this Complaint, Plaintiff seeks to avoid and invalidate as a fraudulent obligation, pursuant to Section 548(a) of title 11 of the United States Code, 11 U.S.C. § 548(a)

(the "Bankruptcy Code"), an alleged obligation of the Debtor to the FDIC-Receiver for the reasons hereinafter set forth.

2.   In motions filed with this Court in the Debtor's Chapter 11 bankruptcy case (the "FDIC Motions"), the FDIC-Receiver asserts that in January 2009 and June 2009, the Debtor incurred substantial obligations to maintain the capital of Colonial Bank, the Debtor's wholly-owned subsidiary, under a memorandum of understanding (the "MOU") and/or a cease and desist order (the "CDO"); that, pursuant to Section 365(o) of the Bankruptcy Code, the Debtor is deemed to have assumed and is obligated immediately to cure any deficit under the MOU and/or CDO; and that the FDIC-Receiver is entitled to a priority claim under Section 507(a)(9) of the Bankruptcy Code.[1]

3.   Plaintiff believes this Court ultimately will conclude that the claims asserted in the FDIC Motions are without merit because, *inter alia*, (a) the FDIC-Receiver is not a party to and does not have standing to enforce any purported obligations of the Debtor under the MOU or the CDO and (b) the Debtor has not made or entered into any "commitment" to a federal depository institution regulatory agency (or a predecessor to such agency) to maintain the capital of Colonial Bank, within the meaning of Section 365(o) of the Bankruptcy Code, whether pursuant to the MOU, the CDO or otherwise.  Nevertheless, in order that the Court may hear and consider all matters arising out of or relating to the averments contained in the FDIC Motions and the Debtor's defenses thereto, Plaintiff has commenced this adversary proceeding for an adjudication that the obligations that the FDIC-Receiver asserts are owed by the Debtor under the MOU and/or the CDO (collectively, the "Purported Maintenance Obligations"), if any, are

---

[1] *See* Emergency Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, for an Order Modifying the Automatic Stay [Doc. No. 156], *and* Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, Montgomery, Alabama, for an Order (A) To Require Cure Deficiencies Under 11 U.S.C. § 365(o) or (B) Converting Debtor's Bankruptcy Case to a Liquidation Under Chapter 7 of the Bankruptcy Code [Doc. No. 257].

constructively fraudulent and therefore subject to avoidance and invalidation under Section 548(a) of the Bankruptcy Code.

## Jurisdiction and Venue

4.      This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) over the subject matter of this adversary proceeding because the relief sought herein arises from a claim under the Bankruptcy Code and is related to a case pending in the United States Bankruptcy Court for the Middle District of Alabama, Northern District (the "Bankruptcy Court").

5.      This adversary proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2) because it arises in or under the Debtor's Chapter 11 case.  Regardless of whether this is a core proceeding, Plaintiff consents to the entry of final orders and judgment by the Bankruptcy Court. The statutory predicate for the relief requested in this Complaint is Section 548(a) of the Bankruptcy Code.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408.

## Service of Process

7.      This Complaint and the summons to be issued in connection herewith may be served pursuant to Bankruptcy Rule 7004 and Rule 4(i) of the Federal Rules of Civil Procedure by (i) delivering a copy of the summons and this Complaint to the United States Attorney for the district where the action is brought, or an Assistant United States Attorney or clerical employee whom the United States Attorney designates in writing filed with the court clerk, or by sending a copy of each by registered or certified mail to the civil process clerk at the United States Attorney's office; (ii) sending a copy of each by registered or certified mail to the Attorney General of the United States at Washington, DC; and (iii) sending a copy of each to the Executive Secretary (or designee), FDIC-Receiver, 550 17th Street, N.W., Washington, D.C.

20429, or upon the agent designated to receive service of process in the jurisdiction in which the insured depository institution is located.

## **Background**

8.      The FDIC-Receiver asserts in the FDIC Motions that on or about January 21, 2009, the Debtor's Board of Directors entered into the MOU with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department and that the MOU is in the form annexed hereto as <u>Exhibit A</u>.

9.      The MOU refers to a separate memorandum of understanding among Colonial Bank, the FDIC-Receiver, and the Alabama State Banking Department, dated December 15, 2008 (the "<u>Bank MOU</u>").  The FDIC-Receiver contends in the FDIC Motions that the Bank MOU is in the form annexed hereto as <u>Exhibit B</u>.

10.      On or about July 22, 2009, the Debtor consented to the entry of a CDO issued by the Board of Governors of the Federal Reserve System and the Alabama State Banking Department.  The FDIC-Receiver contends in the FDIC Motions that the CDO is in the form annexed hereto as <u>Exhibit C</u>.

11.      The CDO refers to a separate cease and desist order dated June 5, 2009, that the Board of Governors of the Federal Reserve System and the Alabama State Banking Department issued and that was consented to by Colonial Bank (the "<u>Bank CDO</u>").  The FDIC-Receiver contends in the FDIC Motions that the Bank CDO is in the form annexed hereto as <u>Exhibit D</u>.

12.      On August 14, 2009, the Alabama State Banking Department closed Colonial Bank, and the FDIC-Receiver was appointed as receiver.

13.      On August 25, 2009, the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

### Claim for Relief

14.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 13 above, as if fully set forth verbatim herein.

15.     The Debtor did not receive reasonably equivalent value, within the meaning of Section 548 of the Bankruptcy Code, in exchange for allegedly incurring the Purported Maintenance Obligations.

16.     At the time of its alleged incurrence of the Purported Maintenance Obligations under the MOU, and/or after giving effect to the alleged incurrence of the Purported Maintenance Obligations thereunder, the Debtor was (i) insolvent within the meaning of Sections 101(32) and 548 of the Bankruptcy Code; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as such debts matured.

17.     At the time of its alleged incurrence of the Purported Maintenance Obligations under the CDO, and/or after giving effect to the alleged incurrence of the Purported Maintenance Obligations thereunder, the Debtor was (i) insolvent within the meaning of Sections 101(32) and 548 of the Bankruptcy Code; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as such debts matured.

18.     As a result of the foregoing, the Purported Maintenance Obligations, if any, are constructively fraudulent and therefore avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order and judgment in favor of Plaintiff and against Defendant as follows:

a.      Adjudicating that the Purported Maintenance Obligations allegedly incurred by the Debtor under the MOU and/or the CDO, if any, are constructively fraudulent under Section 548 of the Bankruptcy Code and therefore avoidable;

b.      Adjudicating that the Purported Maintenance Obligations are invalid, unenforceable and void;

c.      Awarding Plaintiff all costs and expenses incurred by it in connection with this adversary proceeding; and

d.      Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: December 15, 2009

C. Edward Dobbs, Esq.
edobbs@phrd.com

Rufus T. Dorsey, IV, Esq.
rdorsey@phrd.com

PARKER, HUDSON, RAINER & DOBBS LLP
1500 Marquis Two Tower
Atlanta, Georgia 30303
Telephone:     (404) 523-5300
Facsimile:     (404) 522-8409

By:___/s/  Rufus T. Dorsey, IV_____

*Counsel for the Plaintiff*

1374471_3                                    -6-

**<u>Exhibit A</u>**


**<u>MOU</u>**

**Memorandum of Understanding By and Among**

THE COLONIAL BANCGROUP, INC.
Montgomery, Alabama

FEDERAL RESERVE BANK OF ATLANTA
Atlanta, Georgia

and

STATE OF ALABAMA
State Banking Department
Montgomery, Alabama

As reflected in the November 20, 2008 letter to the board, the Federal Reserve Bank of Atlanta has downgraded the overall supervisory rating for The Colonial BancGroup, Inc. (Colonial) to less than satisfactory, reflecting Colonial's overall deterioration in its financial condition that, if left uncorrected, could worsen into a more server situation. Thus, a program of corrective action is warranted as outlined in this Memorandum of Understanding (MOU). This MOU represents an agreement between the board of directors of Colonial, the State of Alabama Banking Department (State), and the Federal Reserve Bank of Atlanta (Federal Reserve) whereby the holding company, through its board, agrees that it will move in good faith to comply with the requirements of the MOU. The program of corrective action is as follows:

1. Colonial will utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with its December 15, 2008 Memorandum of Understanding with the Federal Deposit Insurance Corporation's Atlanta Regional Office (FDIC) and the State of Alabama Banking Department.

2. Colonial's parent company and its directly owned non-bank subsidiaries will not incur or guarantee additional debt without the prior written approval of the Federal Reserve and the State. The holding company is to submit its request to the Federal Reserve 30 days prior to the date on which it wishes to incur additional debt. This restriction also includes any action,

such as refinancing, that would cause a change in debt instruments or a change in any of the terms of the existing debt instruments, i.e., interest rate, maturity date, amortization schedule, etc. The request will include the amount to be borrowed, the source of the funds, and the intended use of the proceeds along with a current and pro forma balance sheet and cash flow statement for the parent bank holding company and/or the non-bank subsidiaries.

3. Colonial will not declare or pay dividends, common or preferred, to its shareholders without the prior written approval of the Federal Reserve and the State. The holding company is to submit its request to the Federal Reserve 30 days prior to the date on which it wishes to declare or pay dividends, supported by a written analysis that clearly shows the payment of dividends to be consistent with the Board of Governors' November 14, 1985 Policy Statement on the Payment of Cash Dividends. All requests shall contain, at a minimum, current and projected information on Colonial's capital, earnings, and cash flow; the Bank's capital, asset quality, earnings and allowance for loan and lease losses; and identification of the sources of funds for the proposed payment or distribution.

4. Colonial will not reduce its capital position by purchasing or redeeming treasury stock without the prior written approval of the Federal Reserve and the State. The holding company is to submit its request to the Federal Reserve 30 days prior to the date on which it wishes to purchase or redeem treasury stock.

5. Within 60 days from the date this MOU is executed, Colonial will submit a plan to the Federal Reserve and the State for servicing its outstanding debt (including trust preferred securities) and funding the parent company's and its non-bank subsidiaries' operations under the assumption that the subsidiary bank is unable to upstream cash dividends to augment parent company cash flow.

6. Within 30 days after each quarter end, beginning March 31, 2009, Colonial will provide the Federal Reserve and the State written confirmation of compliance with these corrective action items.

This MOU is not a "written agreement" for the purposes of Section 8 of the Federal Deposit Insurance Act, as amended.

WHERAS, the parties have caused this MOU to be executed as of the _21_ day of
_____, 2009.


THE COLONIAL BANCGROUP, INC.

By: _____


FEDERAL RESERVE BANK OF ATLANTA                STATE OF ALABAMA

By: _____                By: _____

Each undersigned director of The Colonial BancGroup, Inc. acknowledges that he has read and understands each provision of the MOU and agrees to its terms.

_____
Robert E. Lowder

_____
Lewis E. Beville

_____
Augustus K. Clemons, III

_____
Robert S. Craft

_____
Patrick F. Dye

_____
Hubert L. Harris, Jr.

_____
Clinton O. Holdbrooks

_____
John Ed Mathison, D.M.

_____
Milton E. McGregor

_____
John C. H. Miller, Jr.

_____
Joe D. Mussafer

_____
William E. Powell, III, Ph.D

_____
James W. Rane

_____
Simuel Sippial, Jr.

_____
Edward V. Welch

4 of 4

**<u>Exhibit B</u>**

**<u>Bank MOU</u>**

## Memorandum of Understanding

As reflected in the October 9, 2008 letter to you transmitting the downgrade in the Uniform Financial Institution Rating, Colonial Bank reflected unsatisfactory conditions which, if not corrected, could worsen into a more severe situation. Thus, a program of corrective action is warranted as outlined in this Memorandum of Understanding ("Memorandum"). This Memorandum represents an agreement between the Board of Directors of Colonial Bank and the Regional Director of the FDIC's Atlanta Regional Office and the Superintendent of the State of Alabama Banking Department ("Supervisory Authorities') whereby the Bank, through its Board, agrees that it will move in good faith to comply with the requirements of the Memorandum and eliminate the problems of the Bank. The program of corrective action is as follows (all time periods contained in this Memorandum shall start with the effective date of the agreement):

### ASSET QUALITY

1. Within 30 days, the Bank shall designate, with the approval of the Supervisory Authorities, a qualified chief lending officer who will be given specific written authority by the Board of Directors to implement sound lending practices, improve the quality of the loan portfolio, and serve as the senior officer in terms of overall responsibility for the lending area.

2. Within 60 days, the Bank shall provide written performance reviews of executive lending staff to include regional lending presidents and senior lenders only. Senior lender is defined as the highest ranking lending officer reporting to the regional president with responsibilities that include all or some of the region's production oversight and credit administration. A revised organizational chart for reporting relationships to include the officers reviewed as noted above shall also be provided.

3. By April 30, 2009, the Bank shall develop a system to evaluate and measure the performance of all lenders, to be implemented by June 30, 2009. It shall include written performance reviews with a complete report on the findings as determined through these reviews to include an assessment of talent, skills, and the need for additional outside lending personnel, if deemed necessary.

4. Effective immediately, the balance of assets classified Substandard and Doubtful according to internal loan grades and/or regulatory review findings shall be reduced (through collection, sale, charge-off, or improvement sufficient to warrant removal from classification by examiners) in accordance with the following schedule:

> By June 30, 2009 - to not more than 80 percent of Tier 1 Leverage Capital and Reserves
> By December 31, 2009 - to not more than 70 percent of Tier 1 Leverage Capital and Reserves
> By June 30, 2010 - to not more than 50 percent of Tier 1 Leverage Capital and Reserves

5. Effective <u>immediately</u>, the Bank shall establish and continue to maintain an adequate allowance for loan and lease losses (ALLL) in accordance with the Interagency Policy Statement on ALLL (December 2006). In complying with the requirements of this paragraph, the Bank shall review the adequacy of the ALLL as of the end of each calendar quarter and make appropriate provisions to the ALLL. The results of the review shall be recorded in the minutes of the next Board meeting after which the review was undertaken.

6. During the life of this Memorandum and within <u>30 days</u> of management's receipt of the findings of various targeted reviews commenced in the third quarter 2008 (Targeted Reviews) and thereafter by either FDIC or State examiners, the remaining balance of all assets classified Loss shall be charged off. Additionally, all loans identified as Doubtful, either internally or in any review memo, shall be reviewed for impairment in accordance with FAS 114.

7. Within <u>30 days</u> of management's receipt of this Memorandum or any subsequent Targeted Reviews, the Bank shall perform FAS 114 impairment analyses on all credit relationships of $1 million or more classified Substandard or worse in the examination findings and those over $10 million designated as Substandard internally and adequately provide for the exposures in the ALLL. The Bank will also develop specific action plans and proposals for the reduction and/or improvement for all relationships Adversely Classified or Special Mention in the amount of $10 million or more. Individual and aggregate progress reports toward meeting the reduction and improvement plans will be reported to the Board monthly and the Supervisory Authorities quarterly.

8. Effectively <u>immediately</u>, the Bank shall not extend, directly or indirectly, any additional credit to or for the benefit of any borrower who is obligated in any manner to the Bank on any extension of credit or portion thereof that has been charged off by the Bank or classified <u>Loss</u> or <u>Doubtful</u> in an amount greater than $100,000 in any report of examination, so long as such credit remains uncollected, unless the Board of Directors shall document in writing its <u>prior approval</u> of the extension by a majority of the Board, specifically certifying that the extension of credit is necessary to protect the Bank's interest in the ultimate collection of the credit already granted. In addition, the Bank shall make no additional advances to any borrower whose loans or lines of credit have been adversely classified <u>Substandard</u> in an amount of $10,000,000 or more internally or in any subsequent examination report without the <u>prior approval</u> of a majority of the Board and where the Board documents and certifies that:
   - the extension of credit is in material compliance with the Bank's written loan policy;
   - is adequately secured, as supported by current appraised values;
   - a thorough credit analysis has been performed, including analyses of global cash flows and contingent liabilities, indicating that the extension or renewal is reasonable and justified;

- all necessary documentation has been properly and accurately prepared and filed;
- the extension of credit will not impair the Bank's interest in obtaining repayment of the already outstanding credit; and,
- the Board reasonably believes that the extension of credit or renewal will be repaid according to its terms, or;
- is otherwise determined to be in the best interests of the bank to protect the collateral or satisfy contractual obligations.

For this section the prior approval and certification requirements apply to revolving or closed-end lines of credit only as to re-affirmations of the original extension limits and not to the individual advances made thereafter.

9. By <u>March 31, 2009</u>, and during the life of this Memorandum, the Bank shall review its written loan policies for any changes it deems appropriate, giving consideration to the findings of the Targeted Reviews and future examinations conducted by the FDIC or State examiners. Any revisions to the written loan policy shall be adopted by the Board and fully implemented by officers of the Bank. Any decisions to not incorporate recommendations should be fully documented in the next progress report as well as in any management response to the Targeted Review findings.

10. Within <u>60 days</u>, the Bank shall develop written operating procedures for the Special Assets Department. These procedures should include guidance regarding qualifications of members of this department and management's expectations of their performance. At a minimum, written procedures should establish clear guidelines for the types of troubled assets to be handled by the department, procedures to identify assets meeting this definition, specific procedures for valuing the assets, and formulation of action plans to dispose of the credits.

11. Effective <u>immediately</u>, the Bank shall establish an effective and timely system of loan documentation, take necessary steps to correct technical exceptions, and ascertain that all necessary supporting documentation, or evidence thereof, is obtained and evaluated before any new loan is made or existing loan renewed. Such system shall include tracking and monitoring of exceptions and promote accountability for lending personnel.

12. By <u>March 31, 2009</u>, and annually thereafter by January 1 of each year, the Bank shall review and formulate its objectives relative to asset growth. This review shall specifically include consideration of the Bank's capital and liquidity positions and geographic concentrations.

13. By <u>March 31, 2009</u>, and annually thereafter by January 1 of each year, the bank shall review and formulate its objectives relative to real estate and other lending concentration limits. This effort should conform to Appendix A to 12 CFR Part 365, the *Interagency Guidelines for Real Estate Lending Policies*, and to the joint *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, issued in December 2006, which includes requirements to:

- Establish policy guidelines and approve an overall CRE lending strategy regarding the level and nature of CRE exposures acceptable to the institution, including any specific commitments to particular borrowers or property types.
- Ensure that management implements procedures and controls to effectively adhere to and monitor compliance with the institution's lending policies and strategies.
- Review information that identifies and quantifies the nature and level of risk presented by CRE concentrations, including reports that describe changes in CRE market conditions in which the institution lends.
- Periodically review and approve CRE risk exposure limits and appropriate sublimits (for example, by nature of concentration) to conform to any changes in the institution's strategies and to respond to changes in market conditions.
- Develop a strategy to achieve in a timeline agreeable to the Supervisory Authorities CRE and ADC concentration limits as a percentage of capital as recommended in the interagency guidance.

## CAPITAL

14. By February 28, 2009, the Bank shall have a Tier 1 Leverage Capital ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent. The Tier 1 Leverage and Total Risk-Based Capital ratios shall be calculated utilizing the definitions contained in Section 325.2 of the FDIC Rules and Regulations. Thereafter, in the event that the Tier 1 Leverage Capital ratio falls below 8 percent or the Total Risk Based Capital ratio falls below 12 percent, the Supervisory Authorities should be notified and capital shall be increased in an amount sufficient to meet the ratios required by this provision within 30 days.

15. Effective immediately, the Bank shall not pay any cash dividends on its common stock without the prior written consent of the Supervisory Authorities.

## LIQUIDITY/SENSITIVITY TO MARKET RISK

16. Within 60 days, the Bank shall review and submit to the Supervisory Authorities the Bank's overall liquidity objectives, plans, and procedures that are aimed at improving balance sheet liquidity and core deposit funding, and reducing reliance on wholesale and other volatile liabilities to fund longer term assets. After review by the Supervisory Authorities, the Bank's plans and procedures shall be fully implemented by officers of the Bank.

## EARNINGS

17. Within 30 days, the Bank shall prepare and submit to the Supervisory Authorities a comprehensive budget and earnings forecast for 2009. Budgets for subsequent years during the life of the Memorandum will be due by December 31 of each year. Quarterly progress reports regarding the Bank's actual performance (compared with the budget) shall be submitted concurrently with other reporting requirements set forth in the Memorandum.

## VIOLATIONS

18. Within 60 days of management's receipt of the any written Targeted Review findings, the Bank shall take steps necessary, consistent with sound banking practices, to correct all violations of laws, rules and regulations cited by the Supervisory Authorities, if any. In addition, the Bank shall adopt appropriate procedures to ensure future compliance with all applicable laws, rules and regulations.

## PROGRESS REPORTS

19. During the life of this Memorandum, the Board of Directors shall meet at least once per month and prepare detailed, comprehensive minutes of its actions.

20. Within 30 days of each calendar quarter end, the Bank shall provide progress reports to the Supervisory Authorities detailing the steps taken to comply with the various provisions of this Memorandum. This requirement for progress reports shall continue during the life of this Memorandum unless modified or terminated in writing by the Supervisory Authorities.

December 15, 2008
Date

John D. Harrison
Superintendent of Banks
Alabama State Banking Department

December 15, 2008
Date

Mark S. Schmidt
Regional Director, Atlanta Region
Federal Deposit Insurance Corporation

We, the undersigned directors of Colonial Bank, Montgomery, Alabama, acknowledge receipt and agree to the terms of this Memorandum.

Phillip E. Adams, Jr.

Augustus Clements

Thomas F. Dyas, Jr.

Howell Henderson

Robert E. Lowder

William E. Powell

Simuel Sippial, Jr.

Paul Spina

**Exhibit C**

**CDO**

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

STATE OF ALABAMA
STATE BANKING DEPARTMENT
MONTGOMERY, ALABAMA

| | |
|---|---|
| In the Matter of<br><br><br>THE COLONIAL BANCGROUP, INC.<br>Montgomery, Alabama | Docket No.  09-086-B-HC<br><br>Cease and Desist Order Issued<br>Upon Consent Pursuant to the<br>Federal Deposit Insurance Act,<br>as Amended |

WHEREAS, in recognition of their common goal to maintain the financial soundness of

The Colonial BancGroup, Inc., Montgomery, Alabama, a registered bank holding company

("BancGroup"), and its subsidiary bank, Colonial Bank (the "Bank"), a state chartered

nonmember bank, BancGroup has consented to the issuance of a Cease and Desist Order (the

"Order") by the Board of Governors of the Federal Reserve System (the "Board of Governors")

and the Alabama State Banking Department (the "Superintendent");

WHEREAS, on July 15, 2009, the board of directors of BancGroup at a duly

constituted meeting adopted a resolution authorizing and directing Simuel Sippial, Jr. to

enter into this Order on behalf of BancGroup, and consenting to compliance with each and every

provision of this Order by BancGroup and its institution-affiliated parties, as defined in sections

3(u) and 8(b)(3) of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C.

§§ 1813(u) and 1818(b)(3)), and waiving any and all rights that BancGroup may have pursuant

to section 8 of the FDI Act (12 U.S.C. § 1818) to: (i) a hearing for the purpose of taking evidence

on any matters set forth in this Order; (ii) judicial review of this Order; (iii) contest the issuance of this Order by the Board of Governors pursuant to section 8 of the FDI Act and the Superintendent pursuant to Section 5-2A-12 (1975) of the Alabama Banking Code; and (iv) challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provisions hereof.

NOW, THEREFORE, IT IS HEREBY ORDERED that, pursuant to sections 8(b)(1) and (3) of the FDI Act, and Section 5-2A-12 of the Code of Alabama, that BancGroup and its institution-affiliated parties shall cease and desist and take affirmative action as follows:

**Source of Strength**

1. The board of directors of BancGroup shall take appropriate steps to ensure that the Bank complies with the Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Superintendent effective as of June 15, 2009, and any other supervisory action taken by the Bank's federal or state regulators.

**Capital Plan**

2. Within 30 days of this Order, BancGroup shall submit to the Reserve Bank and the Superintendent an acceptable written plan to maintain sufficient capital at BancGroup, on a consolidated basis, and the Bank, as a separate legal entity on a stand-alone basis.  The plan shall, at a minimum, address, consider, and include:

(a) The consolidated organization's and the Bank's current and future capital requirements, including compliance with the Capital Adequacy Guidelines for Bank Holding Companies: Risk-Based Measure and Tier 1 Leverage Measure, Appendices A and D of Regulation Y of the Board of Governors (12 C.F.R. Part 225, App. A and D) and the applicable capital adequacy guidelines for the Bank issued by the Bank's federal regulator;

2

(b)    the adequacy of the Bank's capital, taking into account the volume of classified credits, concentrations of credit, allowance for loan and lease losses ("ALLL"), current and projected asset growth, and projected retained earnings;

(c)    the source and timing of additional funds to fulfill the consolidated organization's and the Bank's future capital requirements;

(d)    supervisory requests for additional capital at the Bank or the requirements of any supervisory action imposed on the Bank by its federal or state regulator; and

(e)    the requirements of section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)) that BancGroup serve as a source of strength to the Bank.

3.    BancGroup shall notify the Reserve Bank and the Superintendent, in writing, no more than 30 days after the end of any quarter in which BancGroup's consolidated capital ratios or the Bank's capital ratios (total risk-based, tier 1 risk-based, or leverage) fall below the plan's minimum ratios.  Together with the notification, BancGroup shall submit an acceptable written plan that details the steps BancGroup will take to increase its and/or the Bank's capital ratios above the plan's minimums.

**Liquidity Risk Management**

4.    Within 60 days of the date of this Order, BancGroup will submit to the Reserve Bank and the Superintendent an acceptable written plan for liquidity management at the consolidated organization.  The plan will, at a minimum, address, consider, and include:

(a)    Analysis of additional liquidity sources;

(b)    appropriate risk limits for each liquidity source;

(c)    the ability to meet short-term funding needs, including the maintenance of a sufficient asset liquidity cushion; and

3

(d)      a contingency funding plan that includes: (i) an assessment of all potential funding needs; and (ii) the establishment of quantitative triggers.

**Allowance for Loan and Lease Losses**

5.      (a)      Within 30 days of this Agreement, BancGroup, including its nonbank subsidiairies (collectively "BancGroup"), shall eliminate from their books, by charge-off or collection, all assets or portions of assets identified as "loss" that have not been previously collected in full or charged off.  Thereafter BancGroup shall, within 30 days from the receipt of any federal report of inspection, charge off all assets classified or identified as "loss" unless otherwise approved in writing by the Reserve Bank and the Superintendent.

(b)      Within 60 days of this Agreement, BancGroup shall review and revise as appropriate its consolidated ALLL methodology to assure that it is consistent with relevant supervisory guidance, including the Interagency Policy Statements on the Allowance for Loan and Lease Losses, dated July 2, 2001 (SR 01-17 (Sup)) and December 13, 2006 (SR 06-17). BancGroup shall submit a description of the methodology to the Reserve Bank and the Superintendent upon adoption.

(c)      Within 60 days of this Agreement, BanGroup shall submit to the Reserve Bank and the Superintendent an acceptable written program to be implemented for determining, documenting, and recording an adequate consolidated ALLL.  The program shall include policies and procedures to ensure adherence to the consolidated ALLL methodology and provide for periodic reviews and updates to the consolidated ALLL methodology, as appropriate.  The program shall also provide for a review of the consolidated ALLL by the board of directors on at least a quarterly calendar basis.  Any deficiency found in the consolidated ALLL shall be remedied in the quarter it is discovered, prior to the filing of any required regulatory reports, by

4

additional provisions.  The board of directors shall maintain written documentation of its review,

including the factors considered and conclusions reached by the Bancorp or any nonbank

subsidiary in determining the adequacy of the consolidated ALLL.  During the term of this

Agreement, BancGroup shall submit to the Reserve Bank and the Superintendent, within 30 days

after the end of each calendar quarter, a written report regarding the board of directors' quarterly

review of the consolidated ALLL and a description of any changes to the methodology used in

determining the amount of consolidated ALLL for that quarter.

**Dividends and Distributions**

    6.    (a)    BancGroup shall not declare or pay any dividends without the prior

written approval of the Reserve Bank, the Director of the Division of Banking Supervision and

Regulation of the Board of Governors (the "Director"), and the Superintendent.

    (b)    BancGroup shall not directly or indirectly take dividends or any other

form of payment representing a reduction in capital from the Bank without the prior written

approval of the Reserve Bank and the Superintendent.

    (c)    BancGroup and its nonbank subsidiaries shall not make any distributions

of interest, principal, or other sums on subordinated debentures or trust preferred securities

without the prior written approval of the Reserve Bank, the Director, and the Superintendent.

    (d)    All requests for prior approval shall be received by the Reserve Bank and

the Superintendent at least 30 days prior to the proposed dividend declaration date, proposed

distribution on subordinated debentures, and required notice of deferral on trust preferred

securities.  All requests shall contain, at a minimum, current and projected information on

BancGroup's capital, earnings, and cash flow; the Bank's capital, asset quality, earnings, and

ALLL; and identification of the sources of funds for the proposed payment or distribution.  For

5

requests to declare or pay dividends, BancGroup must also demonstrate that the requested

declaration or payment of dividends is consistent with the Board of Governors' Policy Statement

on the Payment of Cash Dividends by State Member Banks and Bank Holding Companies, dated

November 14, 1985 (Federal Reserve Regulatory Service, 4-877 at page 4-323), and Alabama

State policies on dividends.

**Debt and Stock Redemption**

7.      (a)      BancGroup and any nonbank subsidiary shall not, directly or indirectly,

incur, increase, or guarantee any debt without the prior written approval of the Reserve Bank and

the Superintendent.  All requests for prior written approval shall contain, but not be limited to, a

statement regarding the purpose of the debt, the terms of the debt, and the planned source(s) for

debt repayment, and an analysis of the cash flow resources available to meet such debt

repayment.

         (b)      BancGroup shall not, directly or indirectly, purchase or redeem any shares

of its stock without the prior written approval of the Reserve Bank and the Superintendent.

**Compliance with Laws and Regulations**

8.      (a)      In appointing any new director or senior executive officer, or changing the

responsibilities of any senior executive officer so that the officer would assume a different senior

executive officer position, BancGroup shall comply with the notice provisions of section 32 of

the FDI Act (12 U.S.C. § 1831i) and Subpart H of Regulation Y of the Board of Governors

(12 C.F.R. §§ 225.71 *et seq.*) and also provide thirty days prior written notice to the

Superintendent.

(b)     BancGroup shall comply with the restrictions on indemnification and severance payments of section 18(k) of the FDI Act (12 U.S.C. § 1828(k)) and Part 359 of the FDIC's regulations (12 C.F.R. Part 359).

**Approval and Implementation of Plans, a Program, and Progress Reports**

9.     (a)     BancGroup shall submit plans and a program that are acceptable to the Reserve Bank and the Superintendent within the applicable time periods set forth in paragraphs 2, 4, and 5(c) of this Order.

(b)     Within 10 days of approval by the Reserve Bank and the Superintendent, BancGroup shall adopt the approved plans and program.  Upon adoption, BancGroup shall implement the approved plans and program and thereafter fully comply with them.

(c)     During the term of this Order, the approved plans and program shall not be amended or rescinded without the prior written approval of the Reserve Bank and the Superintendent.

10.     Within 30 days after the end of each calendar quarter following the date of this Order, the board of directors shall submit to the Reserve Bank and the Superintendent written progress reports detailing the form and manner of all actions taken to secure BancGroup's compliance with the provisions of this Order and the results thereof, and a parent company only balance sheet, income statement, and, as applicable, a report of changes in stockholders' equity. The Reserve Bank and the Superintendent may, in writing, discontinue the requirements for progress reports or modify the reporting schedule.

**Communications**

11.     All communications regarding this Order shall be sent to:

7

    (a)    Ms. Maria Smith
               Assistant Vice President
               Federal Reserve Bank of Atlanta
               1000 Peachtree Street, N.E.
               Atlanta, Georgia 30309-4470

    (b)    Mr. John D. Harrison
               Superintendent of Banks
               State of Alabama
               State Banking Department
               401 Adams Avenue, Ste. 680
               Montgomery, Alabama 36130-1201

    (c)    Mr. Simuel Sippial, Jr.
               Chairman
               The Colonial BancGroup, Inc.
               100 Colonial Bank Boulevard
               Montgomery, Alabama  36117

**Miscellaneous**

12.     Notwithstanding any provision of this Order to the contrary, the Reserve Bank and the Superintendent may, in their sole discretion, grant written extensions of time to BancGroup to comply with any provision of this Order.

13.     The provisions of this Order shall be binding upon BancGroup and its institution-affiliated parties, in their capacities as such, and their successors and assigns.

14.     Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated or suspended in writing by the Reserve Bank and the Superintendent.

15.     The provisions of this Order shall not bar, estop or otherwise prevent the Board of Governors, the Reserve Bank, the Superintendent, or any other federal or state agency from taking any other action affecting BancGroup or any of its current or former institution-affiliated parties and their successors and assigns.

16.    The Superintendent, having duly approved this Order, and BancGroup, through its board of directors, agree that the issuance of this Order by the Board of Governors shall be binding as between BancGroup and the Superintendent to the same degree and legal effect that such Order would be binding upon BancGroup if the Superintendent had issued a separate Order and included and incorporated all of the provisions of this Order pursuant to the provisions of section 5-2A-12 of the Code of Alabama.


By Order of the Board of Governors of the Federal Reserve System and the Superintendent effective this 22ᴺᴰ day of July, 2009.


THE COLONIAL BANCGROUP, INC.

By: _~Simuel Sippial, Jr.~_
     Simuel Sippial, Jr.
     Chairman


BOARD OF GOVERNORS OF
THE FEDERAL RESERVE SYSTEM

By: _~Robert deV. Frierson~_
     Robert deV. Frierson
     Deputy Secretary of the Board


ALABAMA STATE SUPERINTENDENT
OF BANKS

By: _~John D. Harrison~_
     John D. Harrison
     Superintendent of Banks
     State of Alabama


9

**Exhibit D**

**Bank CDO**

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of ) ) COLONIAL BANK ) MONTGOMERY, ALABAMA ) ) (INSURED STATE NONMEMBER BANK) ) | ORDER TO CEASE AND DESIST FDIC-09-125b |

Colonial Bank, Montgomery, Alabama ("Bank"), having been advised of its right to a Notice of Charges and of Hearing detailing the unsafe or unsound banking practices alleged to have been committed by the Bank and of its right to a hearing on the alleged charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1818(b)(1), and § 5-2A-12, Code of Alabama, 1975, and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT AGREEMENT") with a representative of the Legal Division of the Federal Deposit Insurance Corporation ("FDIC") and the Superintendent of Banks ("Superintendent"), Alabama State Banking Department ("DEPARTMENT"), dated June 3, 2009, whereby solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices, the Bank consented to the issuance of an ORDER TO CEASE AND DESIST ("ORDER") by the FDIC and the DEPARTMENT.

The FDIC and the DEPARTMENT considered the matter and determined that it had reason to believe that the Bank had engaged in unsafe or unsound banking practices.

The FDIC and the DEPARTMENT, therefore, accepted the CONSENT AGREEMENT and issued the following:

## ORDER TO CEASE AND DESIST

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and its successors and assigns cease and desist from the following unsafe and unsound banking practices:

(a)   Operating with inadequate management and Board of Directors ("Board") oversight;

(b)   Operating with inadequate equity capital in relation to the volume and quality of assets held by the Bank;

(c)   Operating with an inadequate methodology for the allowance for loan and lease losses ("ALLL");

(d)   Operating with a liquidity and funds management policy that is insufficient to meet the Bank's current needs;

(e)   Operating with a business strategy that has resulted in unprofitable operations and poor asset quality; and

(f)   Operating with inadequate policies and procedures to monitor and control risks within concentrations of credit in the Bank's loan portfolio.

IT IS FURTHER ORDERED, that the Bank, its Bank-affiliated parties, and its successors and assigns, take affirmative action as follows:

## 1.   **MANAGEMENT**

The Bank shall have and retain qualified management.

(a)   Each member of management shall have qualifications and experience commensurate with his or her duties and responsibilities at the Bank. Management shall include the chief executive officer, senior lending officer, and chief financial officer. All management officials shall have an appropriate level of experience and expertise that is needed to perform his or her duties. Each member of management shall be provided appropriate written authority from the Bank's Board to implement the provisions of this ORDER.

(b)   The qualification of management shall be assessed on their ability to:

(i)   Comply with the requirements of this ORDER;

(ii)   Operate the Bank in a safe and sound manner;

(iii)   Comply with applicable laws and regulations; and

(iv)   Restore all aspects of the Bank to a safe and sound condition, including but not limited to asset quality, capital adequacy, earnings, management effectiveness, risk management, sensitivity to market risk, and liquidity.

(c)   No more than 60 days from the effective date of this ORDER, the Board shall develop a written analysis and assessment of the Bank's management and staffing needs ("management plan"), which shall include, at a minimum:

(i)     Identification of both the type and number of senior executive officer positions needed to manage and supervise properly the affairs of the Bank. This identification should take into consideration the Bank's current financial condition and problem assets;

(ii)    Identification and establishment of such Bank committees that are needed to provide guidance and oversight to active management;

(iii)   Evaluation of each Bank senior executive officer to determine whether these individuals possess the ability, experience, and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and maintenance of the Bank's safe and sound condition; and

(iv)    Preparation of a plan of action to recruit and hire any additional or replacement personnel with the requisite ability, experience, and other qualifications, which the Board determines are necessary to fill Bank senior executive officer positions consistent with the Board analysis, evaluation, and assessment as provided in subparagraphs 1(c)(i) and 1(c)(iii) of this ORDER.

(d)   The Bank shall submit the management plan to the FDIC and the DEPARTMENT (collectively, "Supervisory Authorities") for review and comment prior to Board approval. The Board shall approve the written management plan and any subsequent modification of such plan. The

approval shall be recorded in the minutes of the meeting of the Board. The Bank shall implement the written management plan and any subsequent modification.

(e)   During the life of this ORDER, the Bank shall notify the Supervisory Authorities in writing when it proposes to add any individual to the Bank's Board or employ any individual as a senior executive officer, as that term is defined in section 303.101(b) of the FDIC's Rules and Regulations, 12 C.F.R. § 303.101(b). The notification should include a description of the background and experience of the individual or individuals to be added or employed and must be received at least 30 days before such addition or employment is intended to become effective. The Bank may not add any individual to its Board or employ any individual as senior executive officer unless the Superintendent provides prior written approval of such individual and the Regional Director does not issue a notice of disapproval pursuant to section 32 of the Act, 12 U.S.C. §1831i, with respect to any proposed individual.

## 2.   **BOARD PARTICIPATION**

(a)   The Board shall assure its on-going participation in the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the supervision of all of the Bank's activities, consistent with the role and expertise commonly expected for directors of banks of comparable size and complexity. This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the

following areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged-off, and recovered loans; capitalized interest on loans; loans with interest reserves; investment activity; operating policies; and individual committee actions. Board minutes shall fully document these reviews and approvals, including the names of any dissenting directors.

(b)    Within 30 days from the effective date of this ORDER, the Board shall establish a Board committee ("Directors' Committee"), consisting of at least four members, responsible for overseeing corrective measures with respect to the ORDER, and reporting to the Board. Three of the members of the Directors' Committee shall not be Bank officers. Bank management shall provide the Directors' Committee with monthly reports detailing the Bank's actions with respect to compliance with the ORDER. The Directors' Committee shall present a report detailing the Bank's adherence to the ORDER to the Board at each regularly scheduled Board meeting. Such report and any discussion related to the report or the ORDER shall be recorded in the appropriate minutes of the meeting of the Board and shall be retained in the Bank's records. Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER.

## 3.    CAPITAL

(a)    By September 30, 2009, the Bank shall have a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of

not less than 12 percent. The Tier 1 Leverage and Total Risk-Based Capital ratios shall be calculated using the definitions contained in Section 325.2 of the FDIC's Rules and Regulations, 12 C.F.R. § 325.2. Thereafter, in the event the Tier 1 Leverage Capital Ratio falls below 8 percent or the Total Risk-Based Capital Ratio falls below 12 percent, the Supervisory Authorities should be notified in writing and capital shall be increased in an amount sufficient to meet the ratios required by this provision within 30 days.

(b)  The amount of capital needed to maintain the ratios at the levels required in subparagraph 3(a) shall be in addition to a fully funded ALLL, the adequacy of which shall be satisfactory to the Supervisory Authorities as determined at subsequent examinations and/or visitations.

(c)  Within 60 days from the effective date of this ORDER, the Bank shall submit to the Supervisory Authorities a written capital plan. Such capital plan shall detail the steps that the Bank shall take to achieve and maintain the capital requirements set forth in paragraphs 3(a) and 3(b) above. In developing the capital plan, the Bank must take into consideration:

(i)  The volume of the Bank's adversely classified assets;

(ii)  The nature and level of the Bank's asset concentrations;

(iii)  The adequacy of the Bank's ALLL;

(iv)  The anticipated level of retained earnings;

(v)  Anticipated and contingent liquidity needs; and

(vi)   The source and timing of additional funds to fulfill future capital needs.

In addition, the capital plan must include a contingency plan in the event that the Bank has (i) failed to maintain the minimum capital ratios required by subparagraph 3(a), (ii) failed to submit an acceptable capital plan as required by this subparagraph or (iii) has failed to implement or adhere to a capital plan to which the Supervisory Authorities have taken no written objection pursuant to this subparagraph. Said contingency plan shall include a plan to sell or merge the Bank. The Bank shall implement the contingency plan upon written notice from the Supervisory Authorities.

(d)   Any increase in capital necessary to meet the requirements of the provisions of this paragraph may be accomplished by the following:

(i)   The sale of new securities in the form of common stock;

(ii)   The sale of noncumulative perpetual preferred stock;

(iii)   The direct contribution of cash by the directors, shareholders, or parent holding company of the Bank; or

(iv)   Any other method acceptable to the Supervisory Authorities and approved in advance in writing by the Supervisory Authorities.

(e)   A copy of the plan shall be submitted to the Supervisory Authorities upon its completion for review and comment. Within 15 days from the receipt of any comments from the Supervisory Authorities, the Bank shall incorporate those recommended changes, and the Bank shall implement the plan.

(f)     No increase in Tier 1 capital necessary to meet the requirements of this

ORDER may be accomplished through a deduction from the Bank's

ALLL or other reserve accounts. Further, the Bank shall not lend funds

directly or indirectly, whether secured or unsecured, to any borrower for

the purpose of purchasing Bank or affiliate stock or other securities until

such time as the Bank has achieved the increase in Tier 1 capital required

herein.

(g)     If all or part of the increase in capital required by the provisions of this

paragraph is accomplished by the sale of new securities by the Bank, the

Bank's Board shall adopt and implement a plan for the sale of such

additional securities, including the voting of any shares owned or proxies

held or controlled by them in favor of the plan. Should the

implementation of the plan involve a public distribution of the Bank's

securities (including a distribution limited only to the Bank's existing

shareholders), the Bank shall prepare offering materials fully describing

the securities being offered, including an accurate description of the

financial condition of the Bank and the circumstances giving rise to the

offering, and any other material disclosures necessary to comply with the

Federal securities laws. Prior to the implementation of the plan and, in

any event, not less than 20 days prior to the dissemination of such

materials, the plan and any materials used in the sale of the Bank's

securities shall be submitted to the FDIC's Accounting and Disclosure

Section, 550 17th Street, N.W., Room F-6066, Washington, D.C. 20429

and to the Superintendent, Alabama State Banking Department, 401 Adams Avenue, Suite 680, Montgomery, Alabama 36130-1201 for review. Any changes requested by the Supervisory Authorities to be made in the plan or materials shall be made prior to their dissemination. If the Supervisory Authorities allow any part of the increase in Tier 1 capital to be provided by the sale of noncumulative perpetual preferred stock, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to the interest rate and any convertibility factor, shall be presented to the Supervisory Authorities for prior approval.

## 4.  CONCENTRATIONS OF CREDIT

Within 60 days from the effective date of this ORDER, the Board shall ensure that a risk segmentation analysis is performed with respect to the Concentrations of Credit listed in the Concentrations pages of the Report of Examination dated June 10, 2008 ("Report"). Concentrations should be stratified as the Board deems appropriate, but shall include concentrations identified by industry, geographic distribution, underlying collateral, direct or indirect extensions of credit to or for the benefit of any borrowers dependent upon the performance of a single developer or builder, and other asset groups that are considered economically related. The Board should refer to FIL-104-2006, the *Joint Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, for information regarding risk segmentation analysis. The Board shall also develop a plan to reduce the Bank's exposure to the concentrations of credit listed in the Report. A copy of the plan and the analysis will be provided to the Supervisory Authorities for review and approval. The plan and its implementation shall

be in a form and manner acceptable to the Supervisory Authorities as determined at subsequent examinations and/or visitations.

## 5.   ALLOWANCE FOR LOAN AND LEASE LOSSES

Within 60 days from the effective date of this ORDER, the Board shall revise its policy for determining the ALLL and review the adequacy of its ALLL. The policy for determining the adequacy of the ALLL will be in full compliance with outstanding regulatory and accounting guidance. For the purpose of this determination, the adequacy of the ALLL shall be determined after the charge-off of all loans or other items classified "Loss." The policy shall provide for a review of the ALLL at least once each calendar quarter. Said review should be completed at least ten days prior to the end of each quarter, in order that the findings of the Board with respect to the ALLL may be properly reported in the quarterly Reports of Condition and Income. The review should focus on the results of the Bank's internal loan review, loan and lease loss experience, trends of delinquent and non-accrual loans, an estimate of potential loss exposure of significant credits, concentrations of credit, and present and prospective economic conditions. A deficiency in the ALLL shall be remedied in the calendar quarter it is discovered, prior to submitting the Report of Condition and Income, by a charge to current operating earnings. The minutes of the Board meeting at which such review is undertaken shall indicate the results of the review. The Bank's policy for determining the adequacy of the Bank's ALLL and its implementation shall be satisfactory to the Supervisory Authorities as determined at subsequent examinations and/or visitations.

## 6.  REDUCTION OF CLASSIFIED ITEMS

(a)  Within 60 days from the effective date of this ORDER, the Bank shall formulate a written plan to reduce the Bank's risk exposure in each asset in excess of $10,000,000 classified "Substandard", "Doubtful", or Special Mention according to internal loan grades and/or regulatory review findings. For purposes of this Paragraph 6, "reduce" means to collect, charge off, or improve the quality of an asset so as to warrant its removal from adverse classification by the Supervisory Authorities. In developing the plan mandated by this paragraph, the Bank shall, at a minimum, and with respect to each adversely classified loan, review, analyze, and document the financial position of the borrower, including source of repayment, repayment ability, and alternative repayment sources, as well as the value and accessibility of any pledged or assigned collateral, and any possible actions to improve the Bank's collateral position.

(b)  In addition, the written plan required by this Paragraph 6 shall also include, but not be limited to, the following:

(i)  A schedule for reducing the outstanding dollar amount of each adversely classified asset, including timeframes for achieving the reduced dollar amounts (at a minimum, the schedule for each adversely classified asset must show its expected dollar balance on a quarterly basis);

(ii)  Specific action plans intended to reduce the Bank's risk exposure in each classified asset;

(iii)   A schedule showing, on a quarterly basis, the expected consolidated balance of all adversely classified assets, and the ratio of the consolidated balance to the Bank's projected Tier 1 Capital plus the ALLL;

(iv)   A provision for the Bank's submission of monthly written progress reports to its Board; and

(v)   A provision requiring Board review of the progress reports, with a notation of the review recorded in the minutes of the meeting of the Board.

(c)   The written plan required by this Paragraph 6 shall further require a reduction in the aggregate balance of assets classified "Substandard" according to internal loan grades and/or regulatory review findings in accordance with the following schedule.

(i)   By December 31, 2009, to not more than 100% of Tier 1 Capital plus the ALLL;

(ii)   By June 30, 2010, to not more than 75% of Tier 1 Capital plus the ALLL; and

(iii)   By December 31, 2010, to not more than 50% of Tier 1 Capital plus the ALLL.

(d)   The requirements of this paragraph are not to be construed as standards for future operations of the Bank.  Following compliance with the above reduction schedule, the Bank shall continue to reduce the total volume of adversely classified assets.

(e)   The Board shall approve the plan, which approval shall be recorded in the minutes of the meeting of the Board.  Thereafter, the Bank shall implement and fully comply with the plan.  Such plans shall be monitored and progress reports thereon shall be submitted to the Supervisory Authorities concurrently with the other reporting requirements set forth in this ORDER.

### 7.   SPECIAL MENTION ASSETS

Within 60 days from the effective date of this ORDER, the Bank shall develop a plan to correct all deficiencies in the assets listed for "Special Mention".  The Bank shall immediately submit the plan to the Supervisory Authorities for review and comment. Within 30 days from receipt of any comment from the Supervisory Authorities, and after due consideration of any recommended changes, the Bank shall approve the plan, which approval shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the plan.

### 8.   NO ADDITIONAL CREDIT

(a)   Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been charged-off or classified, in whole or part, "Loss" or "Doubtful" in an amount greater than $100,000 and is uncollected.  The requirements of this paragraph shall not prohibit the Bank from renewing (after collection in cash of interest due from the borrower) any credit already extended to any borrower.

(b)     Additionally, during the life of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower who has a loan or other extension of credit from the Bank that has been classified, in whole or in part, "Substandard" in an amount greater than $10,000,000 and is uncollected.

(c)     Paragraph 8(b) shall not apply if the Bank's failure to extend further credit to a particular borrower would be detrimental to the best interests of the Bank. Prior to the extension of any additional credit pursuant to this paragraph, either in the form of a renewal, extension, or further advance of funds, such additional credit shall be approved by a majority of the Board or a designated committee thereof, who shall certify in writing as follows:

     (i)     Why the failure of the Bank to extend such credit would be detrimental to the best interests of the Bank;

     (ii)    That the Bank's position would be improved thereby; and

     (iii)   How the Bank's position would be improved.

(d)     The signed certification shall be made a part of the minutes of the Board or its designated committee and a copy of the signed certification shall be retained in the borrower's credit file

## 9.     POLICY FOR LIQUIDITY AND FUNDS MANAGEMENT

(a)     The Bank's management shall continue to review its liquidity position weekly to ensure that the Bank has sufficient liquid assets or sources of liquidity to meet current and anticipated liquidity needs. This review shall include an analysis of the Bank's sources and uses of funds (cash flow

analysis). The results of this review shall be presented to the Board for review each month, with the review noted in the minutes of the meeting of the Board. A copy of this review shall be provided to the Supervisory Authorities.

(b)  Within 45 days from the effective date of this ORDER, the Bank shall adopt and implement a written plan addressing liquidity, contingent funding, and asset liability management. A copy of the plan shall be submitted to the Supervisory Authorities upon its completion for review and comment. Within 30 days from the receipt of any comments from the Supervisory Authorities, the Bank shall incorporate those recommended changes. Thereafter, the Bank shall implement and follow the plan. Annually during the life of this ORDER, the Bank shall review this plan for adequacy and, based upon such review, shall make appropriate revisions to the plan that are necessary to strengthen funds management procedures and maintain adequate provisions to meet the Bank's liquidity needs.

(c)  The initial plan shall include, at a minimum:

(i)  A limitation on the ratio of the Bank's total loans to assets;

(ii)  A limitation of the ratio of the Bank's total loans to funding liabilities;

(iii)  Identification of a desirable range and measurement of dependence on non-core funding;

(iv)  Establishment of lines of credit that would allow the Bank to borrow funds to meet depositor demands if the Bank's other provisions for liquidity proved inadequate;

(v)  A requirement for retention of sufficient investments that can be promptly liquidated to ensure the maintenance of the Bank's liquidity posture at a level consistent with short-term and long-term objectives;

(vi)  Establishment of contingency plans to restore liquidity to that amount called for in the Bank's liquidity policy; and

(vii)  Establishment of limits for borrowing federal funds and other funds, including limits on dollar amounts, maturities, and specified sources/lenders.

## 10.   **CASH DIVIDENDS**

The Bank shall not pay cash dividends without the prior written consent of the Supervisory Authorities.

## 11.   **BROKERED DEPOSITS**

(a)  Upon the effective date of this ORDER and so long as this ORDER is in effect, the Bank shall neither renew, roll-over, nor increase the amount of brokered deposits above the amount outstanding as of the effective date of this ORDER without obtaining a waiver from the FDIC . Within 15 days of the effective date of this ORDER, the Board shall adopt a written plan for reducing its reliance on brokered deposits, which approval shall be recorded in the minutes of the meeting of the Board. The plan shall detail

the current composition of brokered deposits by maturity and explain the means by which such deposits will be paid. Thereafter, the Bank shall implement and fully comply with the plan. For purposes of this ORDER, brokered deposits are defined in section 337.6(a)(2) of the FDIC's Rules and Regulations, 12 C.F.R. §337.6(a)(2).

(b) The Bank shall provide a written progress report to the Supervisory Authorities detailing the level, source, and use of brokered deposits with specific reference to progress under the Bank's plan as part of the progress report required by paragraph 13.

(c) The Bank shall comply with the restrictions on the effective yields on deposits described in 12 C.F.R. § 337.6, as amended May 29, 2009.

## 12.   STRATEGIC PLAN

Within 90 days from the effective date of this ORDER, and within the first 30 days of each calendar year thereafter, the Board shall develop and fully implement a written strategic plan consisting of goals and strategies, consistent with sound banking practices, and taking into account the Bank's other written plans, policies, or other actions as required by this ORDER. The Board shall approve the strategic plan, which approval shall be recorded in the minutes of the meeting of the Board. Thereafter, the Bank, its directors, officers, and employees shall fully implement the strategic plan and any subsequently approved modification. The written strategic plan shall include, at a minimum:

(a) Identification of the major areas in and means by which the Board will seek to improve the Bank's operating performance;

(b)    Specific goals to improve the net interest margin, increase interest income, reduce discretionary expenses, and improve and sustain earnings, as well as maintain adequate provisions to the ALLL;

(c)    Coordination of the Bank's loan, investment, funds management, operating policies, strategic plan, and ALLL methodology with the strategic and budget planning;

(d)    A budget review process to monitor the revenue and expenses of the Bank whereby actual performance is compared against budgetary projections not less than quarterly, recording the results of the evaluation and any actions taken by the Bank in the minutes of the meeting of the Board at which such evaluation is undertaken; and

(e)    Individual(s) responsible for implementing each of the goals and strategies of the strategic plan.

### 13.    **PROGRESS REPORTS**

Within 30 days of the end of the first quarter following the effective date of this ORDER, and within 30 days of the end of each quarter thereafter, the Bank shall furnish written progress reports to the Supervisory Authorities detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof. Such reports shall include a copy of the Bank's Report of Condition and the Bank's Report of Income. Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Supervisory Authorities have released the Bank in writing from making further reports.

## 14.   <u>DISCLOSURE TO SHAREHOLDERS</u>

Following the issuance of this ORDER, the Bank shall provide to its shareholders or

otherwise furnish a description of this ORDER (i) in conjunction with the Bank's next

shareholder communication or (ii) in conjunction with its notice or proxy statement

preceding the Bank's next shareholder meeting.  The description shall fully describe the

ORDER in all material respects.  The description and any accompanying communication,

statement, or notice shall be sent to the FDIC, Division of Supervision and Consumer

Protection, Accounting and Securities Disclosure Section, 550 17th Street, N.W., Room

F-6066, Washington, D.C. 20429 and to the Superintendent, Alabama State Banking

Department, 401 Adams Avenue, Suite 680, Montgomery, Alabama 36130-1201, to

review at least twenty (20) days prior to dissemination to shareholders.  Any changes

requested to be made by the FDIC and the DEPARTMENT shall be made prior to

dissemination of the description, communication, notice, or statement.

This ORDER shall become effective immediately on the date of its issuance.  The

provisions of this ORDER shall remain effective and enforceable except to the extent

that, and until such time as, any provisions of this ORDER shall have been modified,

terminated, suspended, or set aside by the FDIC and the DEPARTMENT.

Pursuant to delegated authority.

Dated at Atlanta, Georgia, this 15th day of June, 2009.

Doreen R. Eberley
Acting Regional Director
Atlanta Region
Federal Deposit Insurance Corporation

The Alabama Superintendent of Banks, having duly approved the foregoing ORDER, and the Bank, through its Board, agree that the issuance of said ORDER by the Federal Deposit Insurance Corporation shall be binding as between the Bank and the Alabama Superintendent of Banks to the same degree and legal effect that such ORDER would be binding on the Bank if the Alabama Superintendent of Banks had issued a separate ORDER that included and incorporated all the provisions of the foregoing ORDER pursuant to the provisions of the §5-2A-12, Code of Alabama,1975.

Dated this 5ᵗʰ day of June , 2009.

John D. Harrison
Superintendent of Banks
Alabama State Banking Department