# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

```
------------------------------------------------- x
                                                   :
In re:                                             :        Chapter 11
                                                   :
THE COLONIAL BANCGROUP, INC.,                      :        Case No. 09-32303 (DHW)
                                                   :
                   Debtor.                         :
------------------------------------------------- x
                                                   :
THE COLONIAL BANCGROUP, INC.,                      :
                                                   :
                   Plaintiff,                      :
                                                   :
            v.                                     :        Adv. Proc. No. 09-03087 (DHW)
                                                   :
THE FEDERAL DEPOSIT INSURANCE                      :
CORPORATION, as Receiver                           :
for Colonial Bank,                                 :
                                                   :
                   Defendant.                      :
------------------------------------------------- x
```

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER, TO DISMISS THE COMPLAINT OR STAY THIS ADVERSARY PROCEEDING

Of Counsel:

Thomas R. Califano
John J. Clarke, Jr.
Jeremy R. Johnson
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500

Dated: January 26, 2010

Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, Alabama 36117
(334) 215-4422


*Attorneys for the*
*Federal Deposit Insurance Corporation*
*as Receiver for Colonial Bank*

# Table of Contents

Page

Table of Authorities ......................................................................................... ii

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND .................................................................................................... 4

      A.     Summary of Allegations ........................................................ 4

      B.     The Debtor's Claim for Relief ................................................ 6

ARGUMENT ........................................................................................................ 7

    I.     THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ..................... 7

      A.     The Conclusory Allegations of the Complaint Fail to Meet Minimum Pleading Requirements ..................................... 8

      B.     The Debtor Received "Reasonably Equivalent Value" for its Capital Maintenance Commitment as a Matter of Law .......................... 11

    II.    IF THE COMPLAINT IS NOT DISMISSED, THIS ACTION MUST BE STAYED UNTIL THE DEBTOR'S CASE IS CONVERTED TO A CHAPTER 7 LIQUIDATION ............................................................ 15

CONCLUSION ..................................................................................................... 17

## <u>Table of Authorities</u>

<u>Page</u>

<u>Cases</u>

*Ashcroft v. Iqbal,*
   556 U.S. ___, 129 S. Ct. 1937 (2009)............................................................................ *passim*

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).........................................................................................9, 10, 11

*Branch v. F.D.I.C.,*
   825 F. Supp. 384 (D. Mass. 1993) ................................................................. 12-14

*Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.),*
   6 F.3d 1119 (5th Cir. 1993) ...................................................................12

*CareerCom Corp. v. United States Dep't of Educ. (In re CareerCom Corp.),*
   215 B.R. 674 (Bankr. M.D. Pa. 1997) .................................................12

*Cooper v. Ashley Comms., Inc. (In re Morris Comms. NC, Inc.),*
   914 F.2d 458 (4th Cir. 1990) ...................................................................15

*Davila v. Delta Air Lines, Inc.,*
   326 F.3d 1183 (11th Cir. 2003) ................................................................11

*Franklin Sav. Corp. v. O.T.S.,*
   303 B.R. 488 (D. Kan. 2004) ...................................................................16

*Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.),*
   23 B.R. 28 (Bankr. N.D. Ala. 1982) .......................................................14

*General Elec. Cap. Corp. v. Murphy (In re Rodriguez),*
   895 F.2d 725 (11th Cir. 1990) .................................................................12

*Gold v. Winget (In re NM Holdings, LLC),*
   407 B.R. 232 (Bankr. E.D. Mich. 2009).................................................8

*Goveart v. Capital Bank (In re Miami Gen. Hosp.),*
   124 B.R. 383 (Bankr. S.D. Fla. 1991) ....................................................13

*Howco Leasing Corp. v. Alexander Dispos-Haul Sys., Inc.*
   *(In re Alexander Dispos-Haul Sys., Inc.)*, 36 B.R. 612 (Bankr. D. Ore. 1983) ......................13

Page

*Imperial Credit Indus. Inc. v. F.D.I.C. (In re Imperial Credit Indus. Inc.),*
   No. 03-cv-08627, slip op. (C.D. Cal. Feb. 15, 2005), *aff'd in part,*
   *rev'd in part on other grounds,* 527 F.3d 959 (9th Cir. 2008)......................................3, 16, 17

*In re Augie/Restivo Baking Co.,*
   87 B.R. 242 (Bankr. E.D.N.Y. 1988)...................................................................................12

*Johnson v. First Nat'l Bank,*
   81 B.R. 87 (Bankr. N.D. Fla. 1987)......................................................................................13

*Lawrence Paperboard Corp. v. Arlington Tr. Co. (In re Lawrence Paperboard Corp),*
   76 B.R. 866 (Bankr. D. Mass. 1987) ....................................................................................12

*Lowe v. B.R.B. Enters., Ltd. (In re Calvillo),*
   263 B.R. 214 (W.D. Tex. 2000).............................................................................................14

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
   945 F.2d 635 (3rd Cir. 1991) ................................................................................................12

*Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L., Inc.*
   *(In re R.M.L., Inc.),* 92 F.3d 139 (3rd Cir. 1996)...........................................................12, 14

*Official Comm. Of Equity Security Holders of Adelphia Comms.Corp. v. Official Comm.*
   *Of Unsecured Creditors of Adelphia Comms. Corp. (In re Adelphia Comms. Corp.),*
   544 F.3d 420 (2d Cir. 2008)....................................................................................................5

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.),*
   236 F.3d 1246 (10th Cir. 2001) ...........................................................................................16

*OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.),*
   325 B.R. 696 (Bankr. D. Del. 2005) ...................................................................................7-8

*Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*
   *(In re Pembroke Dev. Corp.),* 124 B.R. 398 (Bankr. S.D. Fla. 1991) .....................................13

*Redwood Raevine Corp. v. Hayes (In re Hannover Corp.),*
   310 F.3d 796 (5th Cir. 2002) ................................................................................................14

*R.T.C. v. FirstCorp. (In re FirstCorp., Inc.),*
   973 F.2d 243 (4th Cir. 1992) .......................................................................................2, 3, 16

*Rubin v. Mfrs. Hanover Tr. Co.,*
   661 F.2d 979 (2nd Cir. 1981)...........................................................................................11-12

Page

*Sinaltrainal v. The Coca-Cola Co.,*
 578 F.3d 1252 (11th Cir. 2009) ........................................................................................4, 11

*SouthTrust Bank, N.A. v. Jackson (In re Dur Jac Ltd.),*
 254 B.R. 279 (Bankr. M.D. Ala. 2000)....................................................................................5

*Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.),*
 527 F.3d 959 (9th Cir. 2008) .................................................................................................16

## Statutes and Rules

11 U.S.C. § 365(o) ................................................................................................. *passim*

11 U.S.C. § 548(a)(1)............................................................................................. *passim*

12 U.S.C. § 1821(d)(2) ...................................................................................................4

28 U.S.C. § 157(d) .........................................................................................................3

Federal Rule of Civil Procedure 8(a)(2) .......................................................................7

Federal Rule of Civil Procedure 9(b)..........................................................................7-8

Federal Rule of Civil Procedure 12(b)(6) ............................................................. *passim*

Bankruptcy Rule 7012 ..........................................................................................1, 3, 4, 7

Defendant Federal Deposit Insurance Corporation, as receiver for Colonial Bank, Montgomery, Alabama (the "FDIC-Receiver"), respectfully submits this memorandum of law in support of its motion to dismiss the complaint in this adversary proceeding for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or in the alternative, to stay all proceedings in this adversary proceeding until the debtor The Colonial BancGroup, Inc. (the "Debtor") has cured all existing deficits under its capital maintenance commitment or this chapter 11 case has been converted to a chapter 7 liquidation pursuant to section 365(o) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

Until August 2009, the Debtor was a regulated bank holding company that owned Colonial Bank, a state-chartered bank that was regulated by the Alabama State Banking Department and the Federal Deposit Insurance Corporation (the "FDIC"). In its Form 10-K filed on March 2, 2009, the Debtor informed its investors that it "derive[d] substantially all of its income from dividends received from Colonial Bank." Clearly, the Debtor had powerful reasons to work with bank regulators to ensure that its principal operating subsidiary would continue in business and eventually emerge from the challenges it confronted in 2008 and 2009.

In December 2008, Colonial Bank, through its board of directors, entered into a memorandum of understanding with its bank regulators that required a number of measures to address the bank's deteriorating condition. Among other things, the bank agreed to raise its capital levels so that by the end of February 2009 its Tier 1 Leverage Capital Ratio would be at least 8%. In January 2009, the Debtor, which as a bank holding company had a duty under applicable law to serve as a "source of strength" for its bank subsidiary, entered into its own memorandum of understanding with the Federal Reserve. In it, the Debtor pledged to "utilize its

financial and managerial resources" to assist Colonial Bank, the Debtor's principal operating subsidiary, to comply with its regulatory commitments.

Colonial Bank failed to bring its capital levels into compliance with the promise it made to its regulators by the February 2009 deadline, and the Debtor, in turn, failed to "utilize its financial . . . resources" to ensure that the bank had done so.  Those regulators then insisted on stricter requirements from both the bank and the holding company, in the form of agreed cease and desist orders.  Colonial Bank consented to such a cease and desist order in June 2009 and the Debtor consented to its own cease and desist order in July 2009.  By consenting, the bank and the holding company spared themselves the greater risk, burden and expense that would have accompanied formal regulatory enforcement proceedings against them.  Among other provisions, the Debtor's consent order reaffirmed and incorporated the capital maintenance commitment it had made in its memorandum of understanding.

Congress added section 365(o) to the Bankruptcy Code specifically to prevent bank holding companies, such as the Debtor here, from using chapter 11 to evade their capital maintenance commitments to benefit creditors of a bankrupt holding company at the expense of the federal deposit insurance system.  *See R.T.C. v. FirstCorp., Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 248 (4th Cir. 1992).  In this adversary proceeding, however, the Debtor seeks precisely such relief.

The Debtor's claim that its prepetition capital maintenance commitment somehow amounted to a "constructive fraudulent transfer" should be dismissed.  The rote, conclusory allegations of the Debtor's adversary complaint are exactly the kind of allegations that the Supreme Court has instructed courts to disregard in considering motions to dismiss.  The Debtor has not pleaded a single allegation of fact in support of its constructive fraudulent transfer claim.

To the contrary, the complaint does no more than recite the standards for constructive fraudulent transfer claims that are set forth in section 548 of the Bankruptcy Code and asserts, in wholly conclusory fashion, that the Debtor's promises fall within this standard.  The Supreme Court has instructed that such bare allegations of legal or factual conclusions are insufficient to withstand dismissal.   The complaint therefore must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), as incorporated by Bankruptcy Rule 7012, for failure to state a claim.

Even if the complaint somehow could survive dismissal, however, the avoidance claim asserted in it may not be raised by the Debtor at this time.  Section 365(o) expressly requires a Debtor to "immediately cure" any deficit under a capital maintenance commitment such as the Debtor's here, and the Debtor's failure to do so requires conversion of a chapter 11 case to a chapter 7 liquidation to prevent the abuse of the deposit insurance system that section 365(o) was enacted to prevent.  *See* 11 U.S.C. § 365(o); *FirstCorp.,* 973 F.2d 247-48.  "Trustee defenses," such as the avoidance action here, may not be raised until these threshold requirements are satisfied.  Consequently, even if this adversary proceeding is not dismissed, as it should be, it must be stayed until the Debtor has either cured its substantial deficit under its capital maintenance commitment or this case has been converted to a chapter 7 liquidation.  *See Imperial Credit Indus. Inc. v. F.D.I.C. (In re Imperial Credit Indus. Inc.)*, No. 03-cv-08627, slip op. at 4 (C.D. Cal. Feb. 15, 2005), *aff'd in part, rev'd in part on other grounds*, 527 F.3d 959 (9th Cir. 2008).[1]

---

[1] If this action survives beyond the pleadings stage and is not stayed, resolution of it will require consideration of both title 11 of the United States Code "and other laws of the United States regulating organizations or activities affecting interstate commerce," requiring that the reference be withdrawn by the district court.  *See* 28 U.S.C. § 157(d).  The FDIC-Receiver has filed this motion at this time given the response deadline provided for under the Bankruptcy Rules, but it reserves all of its jurisdictional arguments including without limitation those provided under section 157(d) of the Judicial Code.

3

## BACKGROUND

**A.**     **Summary of Allegations**[2]

    **1.**     **The Parties**

The Debtor was a bank holding company with its principal place of business in Montgomery, Alabama and, prior to its closure, was the parent corporation of Colonial Bank, Montgomery, Alabama.

In an order dated August 14, 2009, the Alabama State Banking Department closed Colonial Bank and appointed the FDIC-Receiver as its receiver. Compl., ¶ 12. By operation of law, the FDIC-Receiver succeeded to the rights, titles, powers and privileges of Colonial Bank, 12 U.S.C. § 1821(d)(2)(A), and it is empowered, among other things, to take over the assets of and operate that institution, collect all obligations and money due the institution, preserve and conserve the assets and property of the institution and place the institution in liquidation and proceed to realize upon its assets, 12 U.S.C. §§ 1821(d)(2)(D), (E).

On August 25, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Compl., ¶ 13. The Debtor continues as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code but currently has no business operations or reasonable prospects of generating future revenue or reorganizing. No trustee or examiner has been appointed.[3]

---

[2] The well-pleaded allegations of the complaint are assumed to be true solely for purposes of this motion to dismiss pursuant to Federal Rule 12(b)(6) and Bankruptcy Rule 7012. "'Unwarranted deductions of fact' in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations." *Sinaltrainal v. The Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1951 (2009)).

[3] On September 28, 2009, the Court entered an order appointing the Official Committee of Unsecured Creditors (the "Creditors Committee"). The Creditors Committee does not have standing to bring or prosecute an avoidance action, which only may be maintained by a debtor or

## 2.      The Debtor's Capital Maintenance Commitment

On December 15, 2008, Colonial Bank entered into a Memorandum of Understanding with the FDIC and the Alabama State Banking Department (the "Bank MOU").  Compl., ¶ 9 & Exh. B.  In the Bank MOU, Colonial Bank agreed, among other things, that "[b]y February 28, 2009, the Bank shall have a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent."  Compl., Exh. B, § 14.

On January 21, 2009, the Debtor, through its board of directors, agreed to its own Memorandum of Understanding with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department (the "MOU").  Compl., ¶ 8 & Exh. A.  Under the MOU, the Debtor agreed to a number of measures related to the financial soundness of its subsidiary Colonial Bank, including a commitment to "utilize its financial and managerial resources to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with the Bank's December 15, 2008 Memorandum of Understanding with" the FDIC and the Alabama State Banking Department.  Compl., Exh. A, § 1.

Both Colonial Bank and the Debtor failed to meet their obligations under their respective agreements.  As a result, on June 15, 2009, Colonial Bank consented to the entry of a cease and desist order by the FDIC and the Alabama Superintendent of Banks under which, among other

---

trustee.  *See* 11 U.S.C. § 548(a) ("The *trustee* may avoid any transfer . . .").  No exception exists or could exist in this case from this prohibition, where the Debtor already is prosecuting this action and where allowing the Creditors Committee to participate would have no effect other than to multiply the fees and expenses that ultimately would be borne by the FDIC-Receiver as a substantial priority creditor of the Debtor's estate.  *See SouthTrust Bank, N.A. v. Jackson (In re Dur Jac Ltd.)*, 254 B.R. 279, 285-86 (Bankr. M.D. Ala. 2000) (adopting strict application of derivative standing); *see generally Official Comm. of Equity Sec. Holders of Adelphia Comms.Corp. v. Official Comm. Of Unsecured Creditors of Adelphia Comms. Corp. (In re Adelphia Comms. Corp.)*, 544 F.3d 420, 423-24 (2d Cir. 2008) (discussing derivative standing as articulated in the Second Circuit).

5

things, the bank reconfirmed its commitment to raise its Tier 1 Leverage Capital Ratio to not less than 8 percent and its Total Risk-Based Capital Ratio to not less than 12 percent.  *See* Compl., ¶ 11 & Exh. D.  Soon thereafter, on July 22, 2009, the Debtor agreed and consented to its own cease and desist order (the "Consent Order") with the Board of Governors of the Federal Reserve System and the Alabama State Banking Department.  In the Consent Order, the Debtor recognized its duty to act as a source of strength to Colonial Bank and reconfirmed its commitment to "take appropriate steps to ensure that the Bank complies with the [Bank's] Order to Cease and Desist . . ."  Compl., Exh. C, § 1.

The FDIC-Receiver has filed a motion in the Debtor's chapter 11 case pursuant to section 365(o) of the Bankruptcy Code, 11 U.S.C. § 365(o), seeking to compel the Debtor to immediately cure the substantial deficit existing under its capital maintenance commitment, which the FDIC-Receiver now estimates to have been approximately $904 million as of the closing of Colonial Bank and the Debtor's petition date.  [Doc. No. 257]  This adversary proceeding reflects an effort by the Debtor to evade those commitments.

**B.      The Debtor's Claim for Relief**

The complaint asserts a single claim for relief, for "constructive fraudulent transfer" of the Debtor's capital maintenance commitment in the MOU and the Consent Order pursuant to section 548(a)(1)(B) of the Bankruptcy Code.  Compl., ¶¶ 14-18.

The Debtor does not claim that its capital maintenance commitment is avoidable due to actual fraud.  Instead, the Debtor alleges in wholly conclusory fashion that:

> At the time of its alleged incurrence of the Purported Maintenance Obligations under the MOU, and/or after giving effect to the alleged incurrence of the Purported Maintenance Obligations thereunder, the Debtor was (i) insolvent within the meaning of Sections 101(32) and 548 of the Bankruptcy Code; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii)

6

intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as such debts matured.

At the time of its alleged incurrence of the Purported Maintenance Obligations under the CDO, and/or after giving effect to the alleged incurrence of the Purported Maintenance Obligations thereunder, the Debtor was (i) insolvent within the meaning of Sections 101(32) and 548 of the Bankruptcy Code; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as such debts matured.

Compl. ¶¶ 16, 17. No allegations of fact are advanced to support any of these conclusory allegations, which instead merely recite the standard for constructive fraudulent transfer set forth in 11 U.S.C. § 548(a)(1)(B).

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The complaint's sole count – for avoidance of the Debtor's capital maintenance commitment as an allegedly constructive fraudulent transfer – should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), as incorporated by Bankruptcy Rule 7012.[4] The complaint fails to plead any facts to support such a claim, relying instead on a conclusory recitation of the elements of a constructive fraudulent transfer. The

---

[4] Some courts have applied the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) to avoidance claims such as those asserted by plaintiff here. *See, e.g., OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("[t]here is no question that Rule 9(b) applies" in a fraudulent transfer action, "whether it is based upon actual or constructive fraud"). Other courts have refused to do so. *See, e.g., Gold v. Winget (In re NM Holdings, LLC)*, 407 B.R. 232, 259 (Bankr. E.D. Mich. 2009) (collecting cases). The FDIC-Receiver respectfully submits that the heightened pleading required under Federal Rule 9(b) for claims of fraud should apply, but plaintiff's bare bones and conclusory allegations fail to state a claim even under the notice pleading requirements of Federal Rule 8(a)(2) and should be dismissed under either standard.

Supreme Court and the Eleventh Circuit have made clear that such allegations cannot withstand dismissal under Rule 12(b)(6).

### A.    The Conclusory Allegations of the Complaint Fail to Meet Minimum Pleading Requirements

The Supreme Court has articulated a two-pronged approach to analyzing the sufficiency of a complaint's allegations.  First, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1950 (2009).  Second, after the court has identified and eliminated conclusory allegations from consideration, it should "next consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("When the allegations in a complaint, however true, [do] not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.").

Here, the Court should not even reach the second prong of the *Iqbal* analysis.  The complaint rests on precisely the type of naked legal conclusions that the Supreme Court in *Twombly* and *Iqbal* held to be insufficient.  *Iqbal*, 129 S. Ct. at 1949 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *see also Sinaltrainal v. The Coca-Cola Company*, 578 F.3d 1252, 1260 (11th Cir. 2009) ("[u]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of the allegations"); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal").

8

To state a claim for constructive fraudulent transfer, a plaintiff must allege, among other things, that the debtor did not receive "reasonably equivalent value" in return for the challenged transfer and that the debtor was insolvent at the time of the transfer or was rendered insolvent by virtue of the transfer.  *See* 11 U.S.C. § 548(a)(1)(B).  An action for a constructive fraudulent transfer cannot proceed without establishing these elements.[5]  The complaint here, however, does not offer a *single allegation of fact* with respect to either of these essential elements of its constructive fraudulent transfer claim.  With respect to the alleged lack of "reasonably equivalent value," the complaint states, in wholly conclusory fashion, that:

> The Debtor did not receive reasonably equivalent value, within the meaning of Section 548 of the Bankruptcy Code, in exchange for allegedly incurring the Purported Maintenance Obligations.

---

[5] Section 548(a)(1)(B) provides:

(a)(1)   The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily

        \*             \*             \*

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)

(I)      was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)      was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III)      intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV)      made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

9

Compl., ¶ 15.  Likewise, with respect to insolvency, the Debtor merely recites, in rote fashion, that:

> At the time of its alleged incurrence of the Purported Maintenance Obligations . . . and/or after giving effect to the alleged incurrence of the Purported Maintenance Obligations thereunder, the Debtor was (i) insolvent within the meaning of Sections 101(32) and 548 of the Bankruptcy Code; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as such debts matured.

Compl., ¶¶ 16, 17.

These allegations are not sufficient to survive dismissal under Rule 12(b)(6). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (punctuation omitted).  But here, beyond its parroting the language of § 548(a)(1)(B), there is nothing in the complaint to provide the Court and the FDIC-Receiver with notice of the factual basis for the Debtor's allegations.

With respect to the alleged lack of "reasonably equivalent value," the complaint never explains the alleged deficiency of the consideration received by the Debtor, nor does it offer even bare facts from which such information might be inferred.  *See Iqbal*, 129 S. Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  The complaint never indicates whether the Debtor contends that it received *no* value whatsoever or whether instead it argues that it received *some* value but that this value was not enough.  Indeed, it is unclear from the conclusory 18-paragraph complaint whether the Debtor has even formed a view as to this question, much less whether there is any legitimate basis to assert it and launch into a costly discovery campaign.

10

Nor does the Debtor make any effort to show that the obvious consideration it received for the capital maintenance commitment – the willingness of its regulators and the regulators of Colonial Bank to allow the enterprise to continue in existence – was somehow inadequate.  As discussed in the next section, for a bank holding company this consideration alone renders a constructive fraudulent transfer claim inactionable as a matter of law.

The Debtor similarly fails to allege any facts to support its conclusory assertion that it was either insolvent at the time of its capital maintenance commitment or was rendered insolvent as the result of it.  More is required than merely the conclusory contention that the Debtor was insolvent at the time, or was rendered insolvent as a result, of the challenged capital maintenance commitment.

As the Supreme Court recognized in *Twombly,* courts "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558.  The complaint does not provide even the basic specificity required to survive dismissal here.

**B.      The Debtor Received "Reasonably Equivalent Value" for its Capital Maintenance Commitment as a Matter of Law**

Section 548(a)(1)(B) precludes the avoidance of a transfer or obligation where the debtor receives a corresponding benefit from the transaction.  *Rubin v. Mfrs. Hanover Tr. Co*., 661 F.2d 979, 991 (2nd Cir. 1981) (discussing predecessor provision of Bankruptcy Act); *see CareerCom Corp. v. United States Dep't of Educ. (In re CareerCom Corp.)*, 215 B.R. 674, 677 (Bankr. M.D. Pa. 1997); *In re Augie/Restivo Baking Co.*, 87 B.R. 242, 247 (Bankr. E.D.N.Y. 1988) (same).  In such a situation, "the debtor's net worth has been preserved" and the interests of its creditors have not been injured.  *Rubin*, 661 F.2d at 991; *see General Elec. Cap. Corp. v. Murphy (In re*

11

*Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (applying rule but concluding that parent did not receive reasonably equivalent value under the facts at issue).

The concept of reasonably equivalent value is not defined in the Bankruptcy Code. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3rd Cir. 1996). Case law, however, has firmly established that the value received by the debtor need not be either tangible or direct, and an indirect economic benefit to the debtor can constitute reasonably equivalent value. *See, e.g.*, *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993); *Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 646-47 (3rd Cir. 1991); *Rubin*, 661 F.2d at 991. Moreover, "[a]lthough the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent. . . ." *Fairchild Aircraft*, 6 F.3d at 1125.

"[T]ransfers to a solvent subsidiary are considered to be for reasonably equivalent value because, since the parent is the sole stockholder of the subsidiary corporation, any benefit received by the subsidiary is also a benefit to the parent." *Branch v. F.D.I.C.*, 825 F. Supp. 384, 399-400 (D. Mass. 1993) (collecting citations); *see also Lawrence Paperboard Corp. v. Arlington Tr. Co. (In re Lawrence Paperboard Corp)*, 76 B.R. 866, 872 (Bankr. D. Mass. 1987). The district court in *Branch* observed that it was "aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value," and therefore found such transfers to be subject to a *rebuttable presumption* that reasonably equivalent value was received. *Branch*, 825 F. Supp. at 400.

This presumption – that value given to a debtor's wholly-owned subsidiary is imputed to its parent corporation – is based on the principle that courts will find "reasonably equivalent

12

value where the debtor and third party 'are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree.'" *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400-01 (Bankr. S.D. Fla. 1991) (citations omitted); *see also Goveartt v. Capital Bank (In re Miami Gen. Hosp.)*, 124 B.R. 383, 395-96 (Bankr. S.D. Fla. 1991) (debtor corporation received indirect benefits in exchange for its repayment of its affiliate's debt because the debtor and its affiliate were so closely connected as to possess an "identity of interest" ); *Johnson v. First Nat'l Bank*, 81 B.R. 87, 88-89 (Bankr. N.D. Fla. 1987) (debtors could not avoid mortgage given to secure loan to their wholly owned corporation as fraudulent transfer in part because "[t]he Johnsons [debtors] and B&J Enterprises, Inc. also share[d] identity of economic interest such that the Johnsons share[d] the benefit conferred on the corporation"); *see also Howco Leasing Corp. v. Alexander Dispos-Haul Sys., Inc. (In re Alexander Dispos-Haul Sys., Inc.)*, 36 B.R. 612, 617 (Bankr. D. Ore. 1983).[6]

The *Branch* presumption is similarly applicable to the Debtor's capital maintenance commitment here, which like a capital contribution to a bank subsidiary conferred an immediate corresponding benefit on the Debtor through its ownership of Colonial Bank.  The capital maintenance commitment that the Debtor seeks to challenge in this adversary proceeding unquestionably bestowed value on the Debtor by ensuring that regulators would allow its operating subsidiary, Colonial Bank, to continue as an operating bank.  In the Debtor's own

---

[6] In this regard, courts have recognized that "[a] loan to a subsidiary corporation will almost always confer a benefit on the parent or stockholders of the corporation since they are the indirect beneficiaries of anything of value coming to the corporation."  *Johnson,* 81 B.R. at 89; *see Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982) ("the passing to a subsidiary of the consideration for a transfer by a debtor-parent may be presumed to be substantial, because the subsidiary corporation is an asset of the parent corporation, and what benefits the asset will ordinarily accrue to the benefit of its owner").

words, Colonial Bank was the business from which the Debtor "derive[d] substantially all of its income."  Nor has Debtor advanced any allegation at all suggesting that it would be entitled to an exception to the *Branch* presumption of "reasonably equivalent value" because its subsidiary Colonial Bank was insolvent.  To the contrary, there is not a single allegation in the complaint suggesting that Colonial Bank was ever insolvent, much less a factually supported allegation that would satisfy the *Iqbal* pleading standard.

The fact that the bank *ultimately* was closed by regulators and that the Debtor thereafter filed for chapter 11 protection is not relevant to the "reasonably equivalent value" analysis. Whether a debtor received reasonably equivalent value in a transaction must be determined as of the time of the transaction, not with the benefit of hindsight.  *Redwood Raevine Corp. v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002); *In re R.M.L., Inc.*, 92 F.3d at 151-52; *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 219 (W.D. Tex. 2000).  "The critical time is when the transfer is 'made.'  Neither subsequent depreciation in nor appreciation in value of the consideration affects the . . . question whether reasonably equivalent value was given." *Cooper v. Ashley Comms., Inc. (In re Morris Comms. NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990)).

Here, no inference can be drawn from the allegations of the complaint other than that the Debtor received "reasonably equivalent value" for its capital maintenance commitment.

## II.   IF THE COMPLAINT IS NOT DISMISSED, THIS ACTION MUST BE STAYED UNTIL THE DEBTOR'S CASE IS CONVERTED TO A CHAPTER 7 LIQUIDATION

Section 365(o) of the Bankruptcy Code provides that:

> [i]n a case under chapter 11 of this title, the trustee *shall be deemed to have assumed* (consistent with the debtor's other obligations under section 507), and *shall immediately cure any* deficit under, *any commitment* by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an

14

insured depository institution, and any claim for a subsequent breach of
the obligations thereunder shall be entitled to priority under section 507.

11 U.S.C. § 365(o) (emphasis added).  As the courts have recognized repeatedly, "[t]he meaning
and function of § 365(o) is plain from its language:  in every Chapter 11 case, the trustee -- or, as
here, the debtor-in-possession . . . 'shall be deemed to have assumed' any capital maintenance
commitment made by the debtor, and if a deficit under such a commitment arises, he '*shall
immediately cure [it]*.'"  *R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 247 (4th
Cir. 1992)  (emphasis added).

Section 365(o) is intended to prevent a bank holding company, such as the Debtor here,
from "us[ing] a Chapter 11 reorganization to jettison the subsidiary in an effort to enhance its
own financial position and that of its creditors. . . . If the holding company is not financially able
to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to
reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option."  *Id.* at 248;
*see also Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 975 (9th Cir.
2008) ("[P]reclusion of reorganization under Chapter 11 is the only consequence Congress
prescribed for a debtor who fails to cure its obligation under § 365(o)."); *O.T.S. v. Overland Park
Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1253 (10th Cir. 2001); *Franklin
Sav. Corp. v. O.T.S.*, 303 B.R. 488, 502 (D. Kan. 2004) ("The remedy for a debtor's inability to
cure the capital deficiency is that the debtor may be prohibited from proceeding under
Chapter 11.").

As the district court recognized in *Imperial Credit*, an avoidance claim, such as the
Debtor's here, is a "trustee defense" that would not be available to a holding company debtor
outside of bankruptcy.  Therefore, a debtor in possession is not permitted to attack its capital
maintenance commitment as a fraudulent transfer under section 548 while remaining in

chapter 11.  Instead, section 365(o) requires that such a defense only can be raised after either the Debtor has cured the deficit under its capital maintenance commitment or its case has been converted to a liquidation under chapter 7.  *See Imperial Credit Indus. Inc.  v. F.D.I.C. (In re Imperial Credit Indus. Inc.)*, No. 03-cv-08627, slip op. at 4 (C.D. Cal. Feb. 15, 2005), *aff'd in part, rev'd in part on other grounds*, 527 F.3d 959 (9th Cir. 2008).[7]

The Bankruptcy Code prohibits the Debtor's tactic here – to remain in chapter 11 while seeking avoidance of its capital maintenance commitment under section 548 of the Bankruptcy Code.  If the complaint in this adversary proceeding survives dismissal, therefore, this adversary proceeding must be stayed in its entirety until the Debtor has cured the deficit under its capital maintenance commitment or until the Debtor's chapter 11 case has been converted to a liquidation under chapter 7 of the Bankruptcy Code.

---

[7]  A copy of the district court's minute order in *Imperial Credit* is attached as Exhibit A to this memorandum of law.  By the time of the appeal in *Imperial Credit*, the holding company's bankruptcy case had been converted to a chapter 7 liquidation and the "trustee defense" argument therefore was moot.  The appellate court reversed the dismissal of the underlying fraudulent transfer action on other grounds that are not presented here.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the FDIC-Receiver respectfully submits that the complaint in this adversary proceeding should be dismissed or, in the alternative, that this action be stayed in its entirety until the Debtor's case has been converted to a chapter 7 liquidation.

Dated:  Montgomery, Alabama
       January 26, 2010

                                 Respectfully submitted,


                                 /s/ Michael A. Fritz, Sr.               
                                 Michael A. Fritz, Sr.
                                 michael@fritzandhughes.com
                                 Fritz & Hughes LLC
                                 7020 Fain Park Drive Suite 1
                                 Montgomery, Alabama 36117
                                 (334) 215-4422

                                 - and -

                                 Thomas R. Califano
                                 thomas.califano@dlapiper.com
                                 John J. Clarke, Jr.
                                 john.clarke@dlapiper.com
                                 Jeremy R. Johnson
                                 jeremy.johnson@dlapiper.com
                                 DLA Piper LLP (US)
                                 1251 Avenue of the Americas
                                 New York, New York  10020-1104
                                 (212) 335-4500

                                 Attorneys for the
                                  Federal Deposit Insurance Corporation
                                  as Receiver for Colonial Bank

**<u>Exhibit A</u>**

PRIORITY
SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES -- GENERAL

Case No. CV 03-8627
Bankruptcy No. AD03-2710ES and LA 03-28969ES

Dated and Filed:  February 15, 2005

Title:  In Re:  Imperial Credit Industries Inc.
        Imperial Credit Industries Inc. v. Federal Deposit Insurance Corp.

**PRESENT:  HONORABLE JAMES V. SELNA, UNITED STATES DISTRICT JUDGE**

Karla J. Tunis                          Not Present
Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

Not Present                             Not Present

**PROCEEDINGS (In Chambers):**  Order Denying Defendant FDIC's motion for immediate
cure of deficit under commitment to maintain capital
(Fld 12-13-04)

The Federal Deposit Insurance Corporation, acting in its corporate capacity, ("FDIC")
moves this Court pursuant to 11 U.S.C. § 365(o) ("Section 365(o)") for an order requiring
debtor Imperial Credit Industries, Inc. ("Imperial") to immediately pay to the FDIC the
deficit of $18,416,872 owed under a February 27, 2002 Performance Guaranty
("Performance Guaranty").  The Court denies the motion.

## Background

This motion arises out of events surrounding the attempted recapitalization of
Southern Pacific Bank ("SPB") between February 2002 and February 2003.

On February 1, 2002, the FDIC notified SPB that it was undercapitalized pursuant to
the Federal Deposit Insurance Act ("FDIA") and associated regulations.  (Fourth Amended
Complaint [hereinafter "FAC"], ¶ 12.)  In accordance with the FDIA and the associated
regulations, SPB was required to file a capital restoration plan with the FDIC by March 1,
2002.  (Id., ¶ 13.)  The same statute and regulations required Imperial to provide a guaranty
that SPB would perform the terms of the capital plan.  See 12 U.S.C. § 1831o(e)(2)(C)(ii).
Imperial executed the Performance Guaranty on February 27, 2002.  (FAC, ¶ 13.)

MINUTES FORM 90
CIVIL - GEN

Page 1 of 4

Initials of Deputy Clerk

According to the terms of the Performance Guaranty, Imperial absolutely and unconditionally guaranteed SPB's performance under the terms of the capital restoration plan. (FAC, Ex. A.)  Imperial's maximum liability under the Performance Guaranty was limited to the lesser of (i) the amount necessary to restore the relevant capital measures of SPB to the levels required for SPB to be deemed adequately capitalized under applicable regulations, or (ii) 5% of SPB's total assets as of December 31, 2001.  (Id.)

Under the capital restoration plan that the FDIC accepted, SPB was required to raise sufficient new capital by July 22, 2002.  (Id., ¶ 19.)  SPB, however, failed to meet this deadline.  (Id.)  As a result, the FDIC contends that Imperial is liable for $18,416,872 ("$18.4 million") under the Performance Guaranty.  (Mot'n, p. 4.)

After a series of attempts to recapitalize SPB, the FDIC closed the bank on February 7, 2003.  (FAC, ¶ 62.)  Imperial then filed its Chapter 11 bankruptcy petition on July 17, 2003. (Id., ¶ 77.)  On November 6, 2003, Imperial filed its adversary complaint, raising as an issue the enforceablity of the Performance Guaranty under Section 365(o).  On January 28, 2004, this Court withdrew the reference with respect to all issues of fact and law raised in the adversary complaint.

## Discussion

The FDIC seeks an order under Section 365(o) requiring Imperial to immediately cure its deficit of $18.4 million on the Performance Guaranty.

Section 365(o) was enacted as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, which was Congress' response to the devastating savings-and-loan crisis.  In re Firstcorp, Inc., 973 F.2d 243, 246 (4th Cir. 1992). One of Congress' goals in passing this legislation was "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6585.  Section 365(o) helped achieve this goal by preventing "the trustee from rejecting any such commitment as an executory contract under his usual 'avoidance' powers" pursuant to 11 U.S.C. § 365(a). Id. at 180, reprinted in 1990 U.S.C.C.A.N. at 6586.

Section 365(o) provides that a Chapter 11 trustee "shall be deemed to have assumed . . . . and shall immediately cure any deficit under any commitment[1] by the debtor to [the FDIC]

---

[1]Courts have broadly defined the term commitment in Section 365(o).  See In re Overland Park Fin. Corp., 236 F.3d 1246, 1252 (10th Cir. 2001) (using the common definition of "commitment," "an agreement or pledge to do something").  The Court finds that the Performance Guaranty at issue falls well within the bounds of the term "commitment" as used in Section 365(o).

MINUTES FORM 90
CIVIL - GEN

Page 2 of 4

Initials of Deputy Clerk ___kjt___

Case 09-03087   Doc 17-1   Filed 01/26/10   Entered 01/26/10 16:06:59   Desc Exhibit
A   Page 3 of 5

to maintain the capital of an insured depository institution." 11 U.S.C. § 365(o). The Tenth and the Fourth Circuits have both concluded that the assumption and cure required by this section are "prerequisites to reorganization under Chapter 11." Firstcorp, 973 F.2d at 248. See also In re Overland Park Fin. Corp., 236 F.3d 1246, 1253 (10th Cir. 2001) (same, citing Firstcorp). If a debtor cannot satisfy its immediate cure obligation, then "§ 365(o) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option." Id. at 248. See also Overland Park, 236 F.3d at 1253 (holding that "before a debtor may proceed with Chapter 11, and acquire Chapter 11 protection, the debtor's commitment to assume and cure its capital deficit must be satisfied").

Because Imperial has filed for bankruptcy under Chapter 11 and because, according to the FDIC, it owes $18.4 million under the Performance Guaranty, the FDIC contends Imperial must cure this deficit before proceeding further under Chapter 11. In response, Imperial asserts a number of defenses that, if valid, would relieve it of any obligation to cure and claims that they must be litigated before this Court can order the immediate cure that the FDIC requests.

As support for its position, Imperial cites Overland Park, in which the Tenth Circuit remanded a case to the Bankruptcy Court to rule on a holding company's defenses before ordering an immediate cure.[2] Id., 236 F.3d at 1253. The Court agrees with Imperial that the holding in Overland Park requires certain defenses to be litigated before a court can order an immediate cure under Section 365(o).[3] The Court, however, also agrees with the FDIC that Overland Park does not require litigation of all defenses a debtor may raise prior to an immediate cure. Rather, this Court finds that the Tenth Circuit's litigation requirement is limited to the type of defenses raised in that action: "obligor" defenses, or defenses based on a debtor's status as a signatory to a commitment, such as a performance guaranty.

While Imperial raises a number of defenses classifiable as "obligor", five in all,[4] it

---

[2] The Tenth Circuit refused to consider the defenses itself because, as a general rule, it does "not consider issues not passed upon below." Overland Park, 236 F.3d at 1253.

[3] The United States government, through the Office of Thrift Supervision ("OTS"), indicated that it shares this view in its appellate brief prepared in connection with the Fourth Circuit's review of Firstcorp. In this brief, the OTS stated that Section 365(o) did not "prohibit judicial challenge to the existence of and amount of the deficit under the net worth maintenance commitment." Brief for Appellee at 16-17, In re Firstcorp., Inc., 973 F.2d 243 (4th Cir. 1992) (No. 92-1108). According to the OTC, "Legitimate disputes may be litigated, but within the statute's command that Firstcorp's obligation to cure fixed 'immediately' on the filing of the Chapter 11 petition." Id.

[4] The Court finds that the following arguments fall into the category of "obligor" defenses: (1) the Performance Guaranty was limited to the March 1, 2002 Plan; (2) the FDIC failed to give pre-petition notice of the amount due and made no pre-petition demand for payment; (3) Section

MINUTES FORM 90
CIVIL - GEN
Page 3 of 4
Initials of Deputy Clerk  kjt

Case 09-03087   Doc 17-1   Filed 01/26/10   Entered 01/26/10 16:06:59   Desc Exhibit
A   Page 4 of 5

also raises two that fall outside this category. These defenses, equitable subordination[5] and fraudulent conveyance,[6] can be categorized as "trustee" defenses, or defenses that can only be asserted on behalf of creditors as a Chapter 11 trustee. Because, under both <u>Firstcorp</u> and <u>Overland Park</u>, Imperial cannot exercise Chapter 11 powers without first curing its deficit, the Court finds that Imperial cannot litigate these defenses prior to satisfaction of the immediate cure obligation under Section 365(o). To do so would be to impermissibly place the debtor and its creditors ahead of the FDIC, to the potential detriment of taxpayers. <u>See</u> <u>Firstcorp</u>, 973 F.2d at 248. Once Imperial cures its deficit, however, and assumes the rights of a Chapter 11 trustee, it will be free to assert these claims against the FDIC.

## Conclusion

Based on the foregoing, the Court finds that, before it can order an immediate cure, Imperial must be given an opportunity to litigate its "obligor" defenses. Because these defenses were not raised in the initial moving papers, but rather, only in the Opposition and Reply, the Court finds that the "obligor" defenses have not been sufficiently briefed to permit a decision at this time. In addition, as noted above, the Court finds that Imperial's "trustee" defenses cannot be litigated before Imperial satisfies any obligation under its Performance Guaranty that may remain after litigation of its "obligor" defenses.

Accordingly, the Court denies the FDIC's motion for an immediate cure pending resolution of the "obligor" defenses.

---

365(o) only applies to Chapter 11 reorganizations, not Chapter 11 liquidations; (4) the post-bankruptcy demand violated the automatic stay and is void <u>ab initio</u>; and (5) the FDIC incorrectly calculated the amount of Imperial's deficit because it based its calculations on SPB's June 30, 2002 call sheets, as opposed to SPB's financial information as of July 22, 2002, the capital restoration plan deadline.

[5] Imperial may argue that its equitable subordination defense is equivalent to the defense of unclean hands that the holding company in <u>Overland Park</u> raised. <u>Id.</u>, 236 F.3d at 1250n.6. Were this argument to be made, however, the Court would disagree. Unclean hands is a generally available equitable defense, and therefore, would be available to a party in any forum. A claim or defense of equitable subordination, on the other hand, may only be raised in bankruptcy court, on behalf of creditors.

[6] In view of the fact that the Court has granted the FDIC's motion to dismiss the fraudulent conveyance claim, this defense is moot.